# EXHIBIT
# 1

## SETTLEMENT AGREEMENT

This Settlement Agreement is entered into by and between the Disability Law Center (hereinafter "DLC"), an individual identified as S.B., an individual identified as A.U., and an individual identified as S.W. (hereinafter collectively the "Named Plaintiffs"), on the one hand, and the Utah Department of Human Services (hereinafter "DHS"), Ann Williamson in her official capacity as Executive Director of DHS, the Utah Division of Substance Abuse and Mental Health (hereinafter the "Division"), Douglas Thomas in his official capacity as Director of the Division, the Utah State Hospital (hereinafter "USH"), and Dallas Earnshaw in his official capacity as Superintendent of USH (hereinafter collectively "Defendants"). Each of the foregoing parties is sometimes referred to as a "party" and collectively as "the parties."

### Recitals

The parties jointly acknowledge the following undisputed facts, which form the background for this Settlement Agreement:

A.      DHS has the statutory obligation under Title 77, Chapter 15 of the Utah Code to provide competency evaluations for persons charged with criminal offenses, and to provide Restoration Treatment (as defined below) for persons found incompetent to proceed.

B.      On behalf of the class of plaintiffs described below, DLC and the other Named Plaintiffs filed a civil action against the Defendants in the United States District Court for the District of Utah (hereinafter the "Court") Disability Law Center, a Utah nonprofit corporation, et al., vs. State of Utah, et al., Case No. 2:15-CV-00645-RJS-BCW (hereinafter the "Litigation"), to challenge the length of time pretrial detainees in Utah's county jails must wait to receive Restoration Treatment.

C.      The purposes of this Settlement Agreement are: (i) for the parties jointly to adopt and implement a strategic plan that will significantly reduce the wait time for Class members (as defined below) to be admitted to Restoration Treatment; (ii) to resolve all claims asserted by the Named Plaintiffs on behalf of the Class in the Litigation; (iii) to provide a mechanism for monitoring Defendants' compliance with this Settlement Agreement and the Plan; and (iv) to provide a mechanism for enforcement of this Settlement Agreement and the Plan.

D.      As discussed below, the Named Plaintiffs claim on behalf of the Class that Defendants violate the rights of criminal defendants who have been found incompetent to stand trial under the Fourteenth Amendment to the United States Constitution and Article I, § 7 of the Utah Constitution, by infringing their liberty interests in being free from incarceration absent a criminal conviction.  Defendants deny Plaintiffs' claims.

E.      DLC is a federally authorized and funded nonprofit corporation established under the Protection and Advocacy for Individuals with Mental Illness Act of 1986, 42 U.S.C. § 10801 *et. seq*.  Plaintiffs S. B., A. U., and S. W. were, at the time the complaint in the Litigation was filed, pretrial detainees who had been declared incompetent to stand trial in a criminal proceeding and committed to the custody of the executive director of DHS for the purpose of treatment intended to restore them to competency.

F.      DHS is the agency of the State of Utah with responsibility to administer or supervise the administration of competency Restoration Treatment under Utah Code Ann. § 77-15-6(1).  The Division is the division of the State of Utah charged with responsibility to ensure the availability of services for people with mental health disorders and substance abuse issues. USH, which operates under the direction of DHS and the Division, is the Utah state psychiatric hospital.  Currently, USH is the only state facility providing Restoration Treatment to Class

members, although Restoration Treatment is also provided to Class members through the State's

Outreach Program designed to restore competency to individuals housed in Utah county jails.

G.      In entering into this Settlement Agreement, Defendants do not admit any

wrongdoing or constitutional violation as to any Named Plaintiff or Class member.  Defendants

do not admit that their conduct, whether actual or alleged, constitutes a legitimate ground for

liability against the State or any Defendant.

H.      On September 27, 2016, the Court in the Litigation certified the following

plaintiff class (the "Class"): all individuals who are now, or will be in the future, (i) charged with

a crime in Utah, (ii) determined by the court in which they are charged to be incompetent to

stand trial, and (iii) ordered to the custody of the executive director of DHS or a designee for the

purpose of treatment intended to restore the defendant to competency, but who remain housed in

a Utah county jail.  On November 7, 2016, the United States Court of Appeals for the Tenth

Circuit denied Defendants' petition for interlocutory review of the Court's certification of the

Class.

I.      Under Utah Code Ann. § 77-15-3(1), whenever a person charged with a public

offense is, or becomes, mentally incompetent to proceed, a petition for inquiry may be filed in

the state district court in which the charge is pending for the determination of the person's mental

competency.  If the court determines that the person is incompetent to stand trial, the court must

order him or her committed to the custody of the executive director of DHS or a designee for

competency restoration treatment.

J.      As the result of limitations on space at USH and limitations on DHS's resources,

some Class members have historically waited months after the state court orders restorative

competency treatment to be admitted to USH for treatment.  During this waiting period, Class

members were incarcerated in county jails, where they received little or no treatment to restore competency from professionals employed by the jail.  As a general matter, Utah's county jails are not specifically designed to provide competency restoration treatment, and jail staff do not administer such treatment.  Accordingly, since July 2014, the State has administered an Outreach Program designed to restore competency to individuals housed in Utah county jails.

K.    With DLC's concurrence, Defendants have formulated and adopted a plan entitled "A Strategic Plan for Providing Utah Adult Mental Health Competency Restoration Services" (June 9, 2017) (the "Plan") to reduce the time during which Class members must wait to receive Restoration Treatment.  A copy of the Plan is attached as Exhibit 1.  The Plan consists of the following elements:

i.    A process for promptly screening and identifying: (a) those Class members who, because of the acuity and nature of their mental illness, should be transferred from jail to the USH Forensic Unit for Restoration Treatment; (b) those Class members whose mental illness is less severe and should be transferred to an Alternative Therapeutic Unit, as defined below, which may be established by USH; (c) those Class members who may likely be restored to competency in a suitable Offsite Forensic Facility, as defined below, operated by USH or under contract with DHS; (d) those Class members who are likely to be restored to competency through the Outreach Program, as defined below, subject to the limits in paragraphs 25(a) and 26, below; (e) those Class members with intellectual or developmental disabilities who should be directed to the Division of Services for People with Disabilities for Restoration Treatment ("DSPD"); (f) those Class members whose mental

condition has stabilized since initial evaluation, with the result that a further evaluation should be made to determine if these Class members are now competent; and (g) those Class members who are unlikely to be restored to mental competence and should be released from DHS custody so that civil commitment, dismissal of charges, or other resolution can occur.

ii.   USH's continued operation and further development of the Outreach Program, as defined below, to screen, treat, assess, and monitor Class members.

iii.   USH's development of one or more Offsite Forensic Facilities for Restoration Treatment of Class members for whom such programs are likely to be a suitable means to restore competency.

iv.   USH's development of one or more Alternative Therapeutic Units for Restoration Treatment of Class members for whom such programs are likely to be a suitable means to restore competency.

v.   Measures to assure that all Class members begin receiving the timely provision of appropriate Restoration Treatment after the state court orders treatment for them.

vi.   Measures to increase the efficient use of the USH Forensic Unit so as to maximize its existing capacity.

vii.   Measures to manage the anticipated growth in the number of people who are likely to become Class members in years to come.

L.   The Court has jurisdiction over the Litigation under 42 U.S.C. §§ 1331 and 1343. The parties agree that venue is proper under 28 U.S.C. § 1391(b)(2). The parties will

4812-4428-3210

jointly submit this Settlement Agreement to the Court for approval, and its terms will not be effective until the Court approves it.

NOW, THEREFORE, in consideration of the mutual promises set forth below, the parties agree as follows:

## Definitions

1. "**Alternative Therapeutic Unit** " means any treatment unit established and operated by USH or under contract with DHS for Restoration Treatment on or off of the USH Campus for Class members who, in USH's professional judgment, do not require hospitalization level of care, but are not appropriate for an Offsite Forensic Facility or the Outreach Program.

2. The "**Class**" means all individuals who are now or will in the future be:

    a.     Charged with a crime in Utah state courts,

    b.     Determined by the court in which they are charged to be mentally incompetent to stand trial,

    c.     Ordered or committed by the court to the custody of the DHS executive director or a designee for the purpose of treatment intended to restore the individuals to competency, but who remain incarcerated in a county jail in Utah, and

    d.     Waiting to begin Restoration Treatment.

3. "**Custody** or **Commitment Order**" means a written order, issued by a court and signed by a judge, which orders a Class member committed to the custody of the executive director of DHS or a designee for the purpose of treatment intended to restore the defendant to competency, as described in Utah Code Ann. § 77-15-6(1).

4812-4428-3210

4.     **"Defendants' Designated Representative"** is Dallas Earnshaw, who has been appointed by Defendants to perform the duties set forth in paragraph 18, below.

5.     **"Forensic Evaluator"** means a licensed independent mental health professional qualified to conduct court-ordered mental illness evaluations of adults in the criminal justice system, who is familiar with and complies with the requirements of Utah Code Ann. § 77-15-1 et. seq., and who is not involved in the treatment of the Class member.

6.     **"Incompetent to proceed"** has the same meaning as set forth in Utah Code Ann. § 77-15-2.

7.     **"Maximum Allowable Wait Time"** means the largest number of days that any Class member is permitted to wait under paragraph 21 to be admitted into Restoration Treatment, as measured from the date on which USH received the Custody Order until the date on which the Class member began receiving Restoration Treatment at USH, at an Alternative Therapeutic Unit, at an Offsite Forensic Facility, through the Outreach Program, or from DSPD.  For purposes of this Settlement Agreement, the wait times for class members who are already incarcerated when the Plan is implemented, or September 30, 2017, whichever is later, will be tracked, but the wait times associated with those current Class members will not count towards compliance with the deadlines established in paragraph 21, below.

8.     The **"Monitor"** is Patrick K. Fox, M.D., who has been appointed by the Court based on the parties' stipulation to perform the duties set forth in paragraphs 20, 26 and 28 below.  Defendants and the Monitor shall promptly negotiate and enter into a retention agreement pursuant to which Defendants shall pay the Monitor a reasonable hourly rate and all necessary expenses incurred in performing those duties, with the exception of the duties set forth

in paragraph 28, as the costs associated with Monitor-led mediation shall be shared by the parties equally.

9.      The "**Monitoring Period**" means five (5) years from the date on which the Court approves this Settlement Agreement.

10.     "**Offsite Forensic Facility**" means a program of Restoration Treatment administered by USH forensic personnel, or by similarly qualified professionals employed by DHS's contractor, at a location other than the USH Campus.  Every Offsite Forensic Facility established by Defendants pursuant to this Settlement Agreement must comply with the requirements of paragraph 24 below.

11.     "**Outreach Program**" means USH's program of screening, treating, assessing and monitoring Class members while they remain residents in county jails and are not residents in any Offsite Forensic Facility.  Outreach Program professionals will screen Class members for the appropriate level of Restoration Treatment; treat Class members whose screening indicates that they are likely to show meaningful progress towards restoration of competency within 30 days, whose symptoms are stabilizing, and who are likely to be referred for re-evaluation and restored to competency within 60 days; assess Outreach Program patients' progress; and monitor Class members who have been restored to competency, wherever they are located, and assist them in remaining competent to stand trial.  Subject to the terms of paragraph 26, below, USH may utilize the Outreach Program as an approved method of Restoration Treatment for a period of one year from the date on which the court approves this Settlement Agreement

12.     "**Restoration Treatment**" in this Settlement Agreement means competency restoration treatment provided by USH forensic personnel or by similarly qualified professionals

8 of 26

employed by DHS's contractor, to Class members in an effort to restore them to competency, in accordance with Utah Code Ann. § 77-15-6(1), regardless of location or level of need.

13. **"Status Report"** means the written report issued by the Defendants' Designated Representative on a monthly basis during the Monitoring Period, pursuant to paragraph 18, below.

14. **"USH Forensic Unit"** has the same meaning as set forth in Utah Code Ann. § 62A-15-901.

15. **"Waitlist"** means the list of individuals committed to the custody of the executive director of DHS and waiting in jail for Restoration Treatment.

### Objectives, Plan Implementation and Measures of Compliance

16. **Timely Restoration Treatment** – Defendants shall take all necessary steps to meet the objective of providing all Class members with timely and appropriate Restoration Treatment.  Pursuant to the screening procedures referenced in paragraph 19, below, and without any unnecessary delay, Defendants shall transport or direct transportation consistent with Utah Code Ann. Sect. 77-15 et seq., of Class members to the appropriate program or location for Restoration Treatment.

17. **Implementation of the Plan** – Subject to the Court's approval of this Settlement Agreement, Defendants shall implement the Plan annexed hereto as Exhibit 1 no later than September 30, 2017, and shall take all steps necessary to diligently follow the Plan during the term of this Settlement Agreement.

18. **Duties of Defendants' Designated Representative** – No later than the tenth day of the month following the end of every month during the Monitoring Period, the Defendants' Designated Representative shall transmit to the Monitor and DLC a Status Report accurately

reporting the status of all Class members then waiting for Restoration Treatment.  Each report must include the following information for each Class member:

    a.    The Class member's name and criminal case number;

    b.    The name of the court that entered the Class member's Custody Order;

    c.    The date of the court's Custody Order;

    d.    The date USH received the Custody Order;

    e.    The name of the jail where the Class member is being held;

    f.    The dates on which the Outreach Program screened the Class member and the results of the screenings, including the current disposition of the Class member for Restoration Treatment;

    g.    The date on which the Class member began receiving Restoration Treatment and the location of the Class member's Restoration Treatment;

    h.    The date, if any, on which the Class member was terminated from DHS custody for any reason;

    i.    The reasons for the Class member's termination from DHS custody, including the name and location of the facility or other setting to which the Class member was transferred, if that information is known to DHS; and,

    j.    The number of days the Class member has spent on the Waitlist.

The report shall also state:  (1) the longest wait time as among all Class members then on the Waitlist; (2) whether the Defendants have complied with the requirements of paragraph 21, below, during the month; and, if applicable, (3) the reasons for Defendants' inability to comply with the requirements of paragraph 21.

4812-4428-3210

Defendants' Designated Representative shall, on request, cooperate with the Monitor in gathering any additional information necessary for the Monitor's reports, which are required in paragraph 20, below.

19.     **Screening deadlines and disposition of Class members** –

a.      Within seventy-two (72) hours, excluding weekends and holidays, of DHS's receipt of the Custody Order with respect to a Class member, a qualified USH Forensic Unit professional shall screen the Class member using a screening tool approved by, and subject to modification and replacement as determined appropriate by, Defendant's Designated Representative and the Monitor. On the basis of the screening, the USH Forensic Unit professional shall determine whether the Class member: (i) should be transferred from jail to the USH Forensic Unit for Restoration Treatment due to the acuity and nature of the Class member's mental illness; (ii) should be transferred to an Alternative Therapeutic Unit; (iii) should be transferred to an Offsite Forensic Facility for Restoration Treatment; (iv) subject to the limits in paragraph 26, below, should be treated by the Outreach Program based on the standards set forth in subparagraph 25(a), below; (v) should be directed to DSPD for Restoration Treatment because of the Class member's intellectual or developmental disabilities; (vi) should be reevaluated by a Forensic Evaluator to determine if the Class member is now competent; or (vii) should be released from DHS custody because it is unlikely that Restoration Treatment would be effective.

b.    As soon as the foregoing determination is made, Defendants shall take all steps necessary to promptly effectuate the appropriate disposition of the Class member.

c.    If the qualified USH Forensic Unit professional determines that the Class member should be directed to DSPD for Restoration Treatment because of the Class member's intellectual or developmental disabilities, USH shall make the referral within 72 hours, excluding weekends and holidays, of the screening determination.  DSPD shall make a determination about whether it is the agency best suited to provide Restoration Treatment to the Class member within 72 hours, excluding weekends and holidays, of the referral from USH.  If DSPD does not accept the referral, USH shall place the Class member back on the Waitlist consistent with the date of the court's Custody Order and comply with the Maximum Allowable Wait Time deadlines in paragraph 21.  The time spent towards the Class member's referral and assessment will not count in computing the Maximum Allowable Wait Time.

d.    If the qualified USH Forensic Unit professional determines that the Class member should be reevaluated by a Forensic Evaluator to determine if the Class member is now competent, a referral to a Forensic Evaluator shall be made within 72 hours, excluding weekends and holidays, of the determination.  If the reevaluation cannot be conducted within 72 hours, excluding weekends and holidays, of the referral, or if the Forensic Evaluator recommends that the Class member is still not competent to

proceed but there is a substantial likelihood that the Class member can be restored to competency in the foreseeable future, USH shall continue administering competency restoration services appropriate for the patient's level of need and shall have complied with the Maximum Allowable Wait Time deadlines in paragraph 21.  The time spent towards the Class member's referral and assessment will not count in computing the Maximum Allowable Wait Time.

e.  If, at any time, the qualified USH Forensic Unit professional identifies an emergent mental health need, the Defendant's Designated Representative shall expeditiously report the circumstances to DLC and the Monitor, describe any action taken by USH, and keep DLC and the Monitor apprised of any subsequent disposition of the Class member.

20.  **Monitor's quarterly reports** – No later than the fifteenth day of the month after the end of each calendar quarter during the Monitoring Period, the Monitor shall report in writing to the Defendants and DLC on Defendants' progress during the preceding quarter in implementing each specific provision of the Plan and in complying with each specific term of this Settlement Agreement.

21.  **Deadlines for reduction in Maximum Allowable Wait Time** –

a.  By March 31, 2018, Defendants shall reduce the Maximum Allowable Wait Time to sixty (60) days.

b.  By September 30, 2018, Defendants shall reduce the Maximum Allowable Wait Time to thirty (30) days.

   c.  By March 31, 2019, Defendants shall reduce the Maximum Allowable

     Wait Time to fourteen (14) days.

 22. **Modification to the Plan** – If Defendants believe that to achieve compliance with

the screening deadlines in paragraph 19 or the Maximum Allowable Wait Time deadlines in

paragraph 21, above, they will require a modification of the Plan, the Defendants' Designated

Representative shall provide the Monitor and DLC with a detailed written explanation of the

necessary modification.  If DLC objects to any proposed Plan modification, it will notify

Defendants' Designated Representative of the objection in writing within fourteen (14) days of

its receipt of the notice of modification.  DLC and Defendants' Designated Representative shall

thereafter confer in good faith to resolve their differences.  If they are unable to resolve their

differences in this manner, the parties will submit their differences to the Monitor for possible

dispute resolution.  If they are unable to resolve their differences in consultation with the

Monitor, the Monitor will make a written report and recommendation to the parties.  If, after

conferring with the Monitor, the parties still disagree as to the proposed modification of the Plan,

either party may move the Court for relief, along with the Monitor's report and recommendation.

In the absence of DLC's consent, Defendants shall not implement proposed changes to the Plan

sooner than sixty (60) days following the issuance of the Defendants' Designated

Representative's written notice required in this paragraph.

 23. **Suspension of deadlines because of special circumstances** – Defendants' ability

to perform their obligations under this Settlement Agreement in a timely manner may depend on

special circumstances beyond their control.  Subject to the following terms and conditions, the

deadline in paragraph 19(a) (hereinafter the "Screening Deadline") and the deadlines in

4812-4428-3210

paragraph 21 (hereinafter the "Maximum Allowable Wait Time Deadlines") may be suspended with respect to one or more Class members:

    a.    The Screening Deadline or the Maximum Allowable Wait Time Deadlines relating to an individual Class member may be temporarily suspended if Defendants conclude that they cannot meet the relevant deadlines because of factors beyond Defendants' control, including (but not limited to): orders of a court that will delay Defendants' performance; motions filed on behalf of the Class member that will delay Defendants' performance; a jail's failure or refusal to clear the Class member for admission to one of Defendants' facilities; a jail's failure or refusal to allow Outreach Program staff access in order to carry out its responsibilities with respect to a Class member; or medical conditions that prevent a Class member's admission to USH. Circumstances in this category shall be referred to as "Individual Special Circumstances."

    b.    The Screening Deadline or the Maximum Allowable Wait Time Deadlines relating to a group of Class members may be temporarily suspended if Defendants conclude that they cannot meet the relevant deadline because of factors beyond their control, including (but not limited to) a national or local disaster impacting admissions to one or more of Defendants' facilities, a labor action that substantially impedes the continued operation of a facility, or an extraordinary and unanticipated increase in the number of court-ordered competency restoration referrals.  Circumstances in this category shall be referred to as "Departmental Special Circumstances."

The failure or refusal of the Utah Legislature to adequately fund Defendants' operations, programs, or the Plan shall not be considered a Departmental Special Circumstance for purposes of this Settlement Agreement.

c.   If, at any time during the term of this Settlement Agreement, Defendants conclude they must suspend either the Screening Deadline or the Maximum Allowable Wait Time Deadlines on account of either an Individual Special Circumstance or a Departmental Special Circumstance, the Defendants' Designated Representative shall immediately give DLC and the Monitor written notice thereof.  The notice shall state the nature of the special circumstance (that is, whether an Individual or Departmental Special Circumstance), names of all of Class members who will be affected by the proposed suspension, and all of the facts constituting the special circumstance.  The notice shall also state which specific deadlines must be suspended and for what specific period.

d.   Any suspension proposed in the notice shall begin on the date on which the notice is received by DLC and the Monitor and shall terminate at the end of the temporary period of suspension, as set forth in the notice, unless modified in accordance with subparagraphs f or g, below.

e.   No suspension of any deadline shall last longer than is justified by the special circumstance identified in the notice.

f.   If either DLC or the Monitor objects to the suspension, or the scope or duration of the suspension, DLC or the Monitor may notify Defendants'

Designated Representative of the objection in writing, and the parties shall promptly confer with each other in good faith to resolve the issue.

g.     If the parties are unable to resolve the issue after the consultation required by subparagraph f above, they will submit the matter to the Monitor for mediation.  In the absence of an emergency requiring immediate relief, none of the parties shall be entitled to file a motion in the Litigation to enforce this Settlement Agreement based upon the suspension until the expiration of thirty (30) days from the date on which the party notifies the other parties of the alleged violation based upon the suspension and efforts to resolve the situation, including Monitor-led mediation, have been exhausted.  The parties shall equally share the costs of Monitor-led mediation.

24.     **Offsite Forensic Facility requirements** – As part of the Plan, Defendants are hereby authorized to develop and implement one or more Offsite Forensic Facilities consistent with the following principles:

a.     Each Offsite Forensic Facility shall be a treatment program located in space that is suitable for Restoration Treatment.  If the space is located in or leased from a county jail, the space and the residents shall be segregated from the jail's general inmate population.

b.     Each Offsite Forensic Facility shall be operated by a multi-disciplinary treatment team consisting of full-time forensic professionals, employed by DHS or by a suitable contractor, of a number that is sufficient to provide those Class members transferred to the Offsite Forensic Facility with

Restoration Treatment.  A sufficient number of staff members shall remain on-site during operational hours.  Each Offsite Forensic Facility shall meet the best practices of professional and clinical standards governing the operation of, and delivery of, Restoration Treatment services at the USH Forensic Unit.

c.     Defendants shall establish and operate one or more Offsite Forensic Facilities with sufficient capacity to meet, in combination with other improvements, the Maximum Allowable Wait Time deadlines in paragraph 21.

d.     The initial Offsite Forensic Facility should preferably be located in the Salt Lake County Metro Jail, in space previously inspected and approved by the representatives of the parties.  The parties affirmatively represent that they are not presently aware of any deficiencies in the management or operation of the Salt Lake County Metro Jail that would preclude, impede, or otherwise interfere with Defendants' ability to establish and operate an Offsite Forensic Facility at the Salt Lake County Metro Jail, or that would preclude, impede, or otherwise interfere with Class members' ability to receive reasonable and adequate medical and mental health care and services while they are housed in the Offsite Forensic Facility at the Salt Lake County Metro Jail.

e.     Defendants will carefully evaluate and, if needed, seek additional funding for a comparable facility for Class members who are women.

4812-4428-3210

25.    **Outreach Program duties** – Subject to the limits of paragraph 26, below, Outreach Program professionals shall conduct timely screening of Class members in accordance with paragraph 19 above and shall:

    a.  Treat Class members who, in the professional's judgment, are likely to show meaningful progress towards restoration of competency within 30 days, whose symptoms are stabilizing, and who are likely to be referred for re-evaluation and restored to competency within 60 days.  Class members in the Outreach Program shall be re-assessed by Outreach Program professionals every two weeks to determine progress toward competency.  Following 30 days of Restoration Treatment in the Outreach Program, Outreach Program professionals will re-assess each Class member to determine if the Outreach Program remains the most clinically appropriate and effective level of care.  A Class member will be disqualified from Restoration Treatment in the Outreach Program if he or she exhibits repeated suicidal ideations with intent to harm, engages in repeated acts of self-harm, persistently refuses medications necessary for competency restoration with no rational basis, exhibits a significant decline in clinical stability, or is diagnosed with a moderate to severe intellectual or developmental disability.  If the Outreach Program professional determines at screening that a Class member should be disqualified from consideration for Restoration Treatment in the Outreach Program, the Class member must be transferred to USH, an Offsite Forensic Facility, or an Alternative Therapeutic Unit within seventy-two (72) hours, excluding weekends and holidays.  Similarly, if the Outreach Program professional determines that the Outreach Program is no longer

clinically appropriate or effective for a Class member, the Class member must be transferred to USH, an Offsite Forensic Facility, or an Alternative Therapeutic Unit within seventy-two (72) hours, excluding weekends and holidays, or referred to DSPD if appropriate;

b.      Facilitate the prompt reevaluation of Class members by a Forensic Evaluator, if justified;

c.      Monitor former Class members as clinically necessary who have been restored to competency and who await trial, to assist them in maintaining their competency until trial.

26.      **Determination of the Outreach Program's effectiveness** – The Outreach Program may be utilized by USH as an approved alternative method of Restoration Treatment under this Settlement Agreement for a period of one year from September 30, 2017.  During this one-year period, the Monitor will gather and analyze information about the Outreach Program's effectiveness in providing Restoration Treatment to Class members, including the number of patients who are restored or are not restored within 60 days, together with any other factors the Monitor deems relevant.  By the end of the one-year period, the Monitor will advise the parties either: (a) that the Outreach Program is effective as a method of Restoration Treatment, in which event the Outreach Program will become a permanent treatment option under this Settlement Agreement; or (b) that it is not effective, in which event its use as a treatment option under this Settlement Agreement will be promptly terminated unless the Monitor prescribes additional steps to improve the Outreach Program's efficacy and USH complies with and implements those steps.

4812-4428-3210

## Approval by the Court and Enforcement

27.      **Court approval and stay of the Litigation** – The parties will jointly move the Court in the Litigation for an order approving this Settlement Agreement and staying all proceedings in the Litigation pending successful implementation of the Plan and compliance with the terms hereof.  This Settlement Agreement shall become effective upon the Court's issuance of an order approving it.  The parties agree that the Court retains continuing jurisdiction over the Litigation to enforce the terms of this Settlement Agreement for five (5) years from the date on which the Court issues an order approving its terms.  Subject to the requirements of paragraph 28 below, any party may move the Court for an order to enforce the Settlement Agreement and/or to lift the stay on the Litigation.  Upon the expiration of the term of this Settlement Agreement, any party may move for dismissal with prejudice of all claims in the Litigation.  If, at the end of the term, no party moves for dismissal, the Court shall enter an order to show cause why all claims should not be dismissed with prejudice.

28.      **Enforcement** – If any party concludes that another party has violated any material provision of this Settlement Agreement, the party will notify the Monitor and other parties, including Defendants' Designated Representative, of the alleged violation in writing. Thereafter the parties will promptly attempt to resolve the alleged violation by conferring with each other in good faith to resolve the issue. If the parties are unable to resolve the alleged violation, they will submit the matter to the Monitor for mediation. In the absence of an emergency requiring immediate relief, none of the parties shall be entitled to file a motion to enforce any provision of this Settlement Agreement until the expiration of thirty (30) days from the date on which the party notifies the other parties in writing of the alleged violation and

21 of 26

efforts to resolve the violation, including Monitor-led mediation, have been exhausted. The parties shall equally share the costs of Monitor-led mediation.

29.     **Attorney fees and costs regarding enforcement** – Subject to the limitations contained in paragraph 28, any party that obtains an order of the Court enforcing a provision of this Settlement Agreement shall be entitled to an award of its reasonable attorney fees and costs incurred.

### General Provisions

30.     **Term** – The term of this Settlement Agreement shall be five (5) years from the date on which the Court issues an order approving its terms.

31.     **Persons bound** – This Settlement Agreement shall be binding on all Defendants and their successors, together with their officers, agents and employees, unless otherwise prohibited by state or federal law.

32.     **Integration** – This Settlement Agreement constitutes the entire agreement among the parties on the matters raised herein, and no other statement, promise, or agreement, either written or oral, made by any party or agent of any party, shall be enforceable.

33.     **Scope** – This Settlement Agreement is not intended to resolve any actual or potential violation of the rights of pretrial detainees other than those specifically addressed in the Litigation.

34.     **Authority of signatories** – The persons signing this Settlement Agreement represent that they have the authority to do so.

35.     **Representations and warranties** – Each party to this Settlement Agreement represents, warrants, and agrees as to itself as follows:

4812-4428-3210

a.      It has fully and carefully reviewed this Settlement Agreement prior to its execution by an authorized signatory.

b.      It has consulted with its attorneys regarding the legal effect and meaning of this Settlement Agreement and all terms and conditions hereof, and that it is fully aware of the contents of this Settlement Agreement and its legal effect.

c.      It has had the opportunity to make whatever investigation or inquiry it deems necessary or appropriate in connection with the subject matter of this Settlement Agreement.

d.      It has not heretofore assigned or transferred, or purported to assign or transfer, to any person or entity any claims that it might have against the other.

e.      It is executing this Settlement Agreement voluntarily and free from any undue influence, coercion, duress, or fraud of any kind.

36.     **Waiver** – No waiver of any of the provisions of this Settlement Agreement shall be deemed or constitute a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the party making the waiver.

37.     **Counterparts** – This Settlement Agreement may be executed in identical counterparts, each of which for all purposes is deemed an original, and all of which constitute collectively one agreement.  The parties intend that faxed signatures and electronically-imaged signatures such as PDF files shall constitute original signatures and are binding on all parties. An executed counterpart signature page delivered by facsimile or by electronic mail shall have

the same binding effect as an original signature page.  This Settlement Agreement shall not be binding until all parties have signed and delivered a counterpart of this Settlement Agreement whether by mail, facsimile, or electronic mail.

      38.    **Modification** – Settlement Agreement may be modified if the parties are in agreement.  Any modification to this Settlement Agreement shall be in writing.

      39.    **Attorney Fees** – Subject to the provisions in paragraph 29, above, each party shall bear his, her or their own attorney fees and costs of court incurred in the matter to the effective date of this Settlement Agreement.

      40.    **Notices** – Any notice or other communication required or permitted under this Settlement Agreement shall be in writing and shall be deemed to have been duly given when (a) mailed by United States registered or certified mail, return receipt requested, (b) mailed overnight express mail or other nationally recognized overnight or same-day delivery service, (c) sent as PDF attachment to electronic mail, or (d) delivered in person, to the parties at the following addresses:

If the Disability Center, to:

      DISABILITY LAW CENTER
      205 North 400 West
      Salt Lake City, Utah 84103

      Attention:    Aaron M. Kinikini
                   Erin B. Sullivan
      Email:         akinikini@disabilitylawcenter.org
                   esullivan@disabilitylawcenter.org

With a copy to:

      Alan L. Sullivan
      Bret R. Evans
      SNELL & WILMER L.L.P.
      15 West South Temple, Suite 1200 Gateway Tower West
      Salt Lake City, Utah 84101

4812-4428-3210

    Email:          asullivan@swlaw.com
                     brevans@swlaw.com

If the Department, to:

    DEPARTMENT OF HUMAN SERVICES
    195 N. 1950 West, 4th Floor
    Salt Lake City, Utah 84116

    Attention:     Ann Williamson
                  Lana Stohl

    Email:          annwilliamson@utah.gov
                     lstohl@utah.gov

If the Division, to:

    DIVISION OF SUBSTANCE ABUSE AND MENTAL HEALTH
    195 North 1950 West, 2nd Floor
    Salt Lake City, Utah 84116

    Attention:     Douglas Thomas
    Email:          dothomas@utah.gov

If the State Hospital, to:

    UTAH STATE HOSPITAL
    1300 Center Street
    Prove, Utah 84603

    Attention:     Dallas Earnshaw
    Email:          dearnshaw@utah.gov

With a copy to:

    OFFICE OF THE UTAH ATTORNEY GENERAL
    Parker Douglas (8924)
    Laura Thompson (6328)
    David Wolf (6688)
    160 East 300 South, Sixth Floor
    Salt Lake City, Utah 84114-0856

    Email:          pdouglas@agutah.gov
                     lathomps@utah.gov

dnwolf@agutah.gov

A party may change the names or address where notice is to be given by providing notice to the other parties of such change in accordance with this paragraph 40.

DATED this ___9th___ day of ___June___, 2017 on behalf of Plaintiffs:

_____
ALAN L. SULLIVAN (3152)
Attorney for Plaintiffs

_____
AARON M. KINIKINI (10225)
Attorney for Disability Law Center

DATED this ___9th___ day of ___June___, 2017 on behalf of Defendants:

_____
LAURA THOMPSON
Utah Assistant Attorney General

_____
ANN S. WILLIAMSON
Executive Director, Utah Department of Human Services

4812-4428-3210

# EXHIBIT
# 1

# A Strategic Plan for Providing
# Utah Adult Mental Health Competency Restoration Services
### Revised June 9, 2017

## INTRODUCTION

The State of Utah provides competency restoration services to individuals court-ordered to the Department of Human Services (DHS) as Not Competent to Proceed (NCP) under Utah Code Ann. §§. 77-15-1 *et. seq*. This plan outlines the process for how these services are delivered and contains information regarding the clinical programs provided. Utah's system of competency restoration services is based on best practices and successful endeavors in Utah and other states. Utah is addressing the increased demand for forensic services by building capacity and programs that are clinically appropriate and cost effective. A best practice model is in the developmental stages nationally. The traditional inpatient approach is no longer viewed as the sole recommended model of care, as evidenced by the fact that at least 10 states now have some form of competency restoration treatment that is conducted in a jail or adapted setting. Utah's model of care includes outpatient treatment; treatment at an offsite forensic facility; treatment at alternative therapeutic units; and inpatient competency restoration treatment programs. This comprehensive system of care includes vital components for processing court orders, assigning court-ordered evaluations to forensic examiners, screening individuals found NCP for appropriate program placement, treatment plan development, clinical and educational competency restoration services, evaluating clinical progress, tracking outcomes data, and discharge planning. Ongoing communication and collaboration with the courts, correctional facilities, and attorneys is vital to operational efficiency.

## COMPETENCY RESTORATION OVERVIEW

Historically, competency restoration services have been provided at the Utah State Hospital's (USH) forensic inpatient unit. Over the past 30 years, the demand for forensic services in Utah and nationwide has experienced exponential growth, creating a strain on existing resources. Some of the circumstances that have contributed to this growth in Utah include an increase in 1) the number of competency petitions filed; 2) the number of people found NCP by the courts and referred to DHS; and 3) the acuity level of patients entering the system. Some states have converted non-forensic inpatient beds into forensic beds to respond to the increased demand. In many states, competency restoration services are being provided in non-inpatient settings allowing provision for a more efficient and appropriate level of care for those individuals not needing an inpatient level of competency restoration services. According to a report by the Washington State Institute for Public Policy (*Standardizing Protocols for Treatment to Restore Competency to Stand Trial: Interventions and Clinically Appropriate Time Periods*, January 2013), there are five treatment modalities in the literature to address the competency restoration needs of those found NCP that include:

>    (1) Medications;
>    (2) Treatment for individuals with developmental disabilities;
>    (3) Educational treatment programs;

(4) Specialized/individual treatment programs; and
(5) Cognitive remediation programs.

The study also describes incompetence as predicated on two components that are typically addressed in treatment: (1) a mental disorder or cognitive impairment and (2) a deficit in one or more competence-related abilities (i.e., understanding, appreciation, reasoning, assisting counsel) that occur as a result of the mental disorder or cognitive impairment. Improvement in the underlying mental disorder or cognitive impairment often results in the improvement in competence-related deficits. This forms the basis for psychotropic medications being one of the primary treatment modalities in competency restoration treatment. In addition, the use of educational approaches to increase the patient's factual understanding of the legal proceedings and to assist in participating with their defense counsel is beneficial.

The Washington State Institute for Public Policy report revealed limited success in competency restoration outcomes for individuals with intellectual and/or developmental disabilities. Most programs that have been studied demonstrate a 33 percent average competency restoration rate for individuals with intellectual disabilities compared to a 70 percent average for those with mental illness. The "Slater Method" is a competency restoration tool that is typically used to treat individuals with intellectual disabilities. Length of time to restoration is longer for people with intellectual disabilities than the time to restoration for people without intellectual disabilities. It has been DHS' experience that most individuals who require specialized services for intellectual disabilities do better when treated under the supervision of state agencies designed to treat the unique needs of this population. Utah identifies these individuals when referred to DHS and makes every effort to direct their competency restoration treatment to the Division of Services for People with Disabilities (DSPD).

Most research demonstrates that individuals who participate in education groups have a significantly higher rate of restoration than those who do not. Many states across the country have implemented education programs that are of varying structure and delivery styles. Yet, the basic components are similar. Programs in the North Coast Behavioral Healthcare System in Ohio; the Alton Mental Health and Development Center in Illinois; the Atascadero Hospital in California; the RISE program in Denver, Colorado; as well as others, include treatment modalities such as: educational groups; experiential modules, such as mock trials; medication management; and cognitive remediation. These best practice principles are incorporated into Utah's restoration program development. Another well recognized program used to inform Utah's model of care is the 'Comp-Kit' restoration program developed and implemented in 2006 by Florida's mental health forensic system.

Even though the literature is limited and does not specifically identify one national best practice model for competency restoration, current programs have similar components and outcomes. The National Judicial College in Reno, Nevada assembled a panel of experts to develop a Mental Competency Best Practice Program. Though the main tenet of their recommended approach is similar as that described above, it is recommended that clinicians assess the individual's need for competency restoration and tailor the program individually rather than placing all individuals into the same curriculum and treatment modalities.

**SUMMARY of ESSENTIAL RESTORATION SYSTEM ELEMENTS:**

1. Court-ordered competency restoration process

2. Court referral monitoring system

3. Initial treatment screening to determine appropriate level of service delivery

4. Initial mental health evaluation

5. Identification of barriers to competency restoration

6. Development of an individualized treatment plan

7. Engagement of treatment modalities

8. Ongoing progress towards competency assessments

9. Documentation of interventions and response to interventions

10. Re-evaluation of competency

11. Court Referral and reporting process

**STRATEGIC ACTION PLAN**

In order to ensure the State of Utah has adequate resources available to provide competency restoration services to individuals who have been court-ordered to DHS, it is imperative that a

strategic action plan be developed, implemented, and have ongoing evaluation to assure timely provision of treatment services.

A wider array of stakeholders must be engaged to more fully address the competency restoration needs of the citizens of Utah. Successful implementation of a strategic plan requires co-operation, communication and collaboration with a variety of stakeholders and participants involved in the competency restoration process, including, but not limited to: the district courts; referring county and municipal courts; prosecutors; the defense bar; the counties/Local Mental Health Authorities (LMHAs); local sheriffs' offices and jails; law enforcement; and the Utah Legislature.

Outcomes used to assist in this determination will include service access wait times, restoration rates, and length of time for restoration. Each service delivery option will be evaluated for efficiencies and appropriate patient placements.

Each year, DHS, in collaboration with other state leaders, will review these outcomes and make proposals when increased resources are necessary. Options may include: additional offsite forensic facilities; alternative therapeutic units located on or off the USH campus; additional beds at USH; and addressing timely and appropriate competency restoration treatment for women in a clinically appropriate setting. Counties are encouraged to consider pre-evaluation processes to facilitate access to mental health services for individuals with serious mental illness, prior to, or upon entering the criminal justice system, and redirect individuals from entering the forensic system when community services are more appropriate.

1. **Purposes and Implementation of the Strategic Plan**

The purposes of this strategic plan are as follows:

(a)   Outline the specific steps to be taken to reduce the period of time during which patients committed to DHS must wait to receive competency restoration treatment;

(b)   Comply with the timeframes established in the Settlement Agreement approved by the Court in the matter of *Disability Law Center, et. al. v. State of Utah, Department of Human Services, et. al., Case No. 2:15-cv-00645-RJS-BCW.*

(c)   Implement a series of indicators that will measure the quality and efficiency of competency restoration treatment for patients committed to DHS for competency restoration treatment; and

(d)   Monitor and adjust resource investment and allocation to achieve the purposes of the strategic plan.

The implementation of this strategic plan is to be contemporaneous with the establishment of the first offsite forensic facility proposed at the Salt Lake County Metro Jail, or September 30, 2017, whichever occurs later.

**2.     Service Delivery Options**

Like many other states, Utah has recognized the need for additional cost-effective and clinically appropriate services to meet the demand for forensic services. In 2014, USH, in collaboration with the Division of Substance Abuse and Mental Health (DSAMH) and DHS, recommended four levels of treatment services that are appropriate for competency restoration. This was presented in response to a 2014 legislative audit. They are listed in order from the least to highest associated clinical need:

      a) <u>Outreach Program</u>: Providing competency restoration treatment to patients:
          i.     on release from the court in the community;
         ii.     in jail within their home community; or
        iii.     in prison.

      b) <u>Offsite Forensic Facility</u>: Providing competency restoration treatment to patients in a specialized, structured competency restoration program within a jail or other secure setting.

      c) <u>Alternative Therapeutic Unit</u>: Providing competency restoration treatment in any treatment unit established and operated by USH or under contract with DHS on or off of the USH campus for patients who do not require hospitalization level of care.

      d) <u>Inpatient Forensic Beds at USH</u>: There is capacity but not infrastructure for expansion of inpatient hospital beds at the USH campus.

Not all patients referred to DHS for competency restoration treatment require hospital inpatient level of care and its associated interventions. Screening processes are designed to identify persons found NCP who can, within a reasonable timeframe, be restored to competence in the least restrictive, clinically appropriate environment and without requiring admission to an inpatient setting.

There are identifiable advantages to offering outpatient competency restoration services to individuals with lower psychiatric acuity levels including:

      a) Decreased incarceration time
      b) Decreased transportation costs
      c) Improved supports to assist in treatment within their local communities
      d) Enhanced access to community mental health treatments
      e) Facilitated access into ongoing outpatient treatment support systems
      f) Ongoing access to defense counsel, family, and other supports
      g) Reduced stigma associated with psychiatric hospitalization.

If a patient is placed in any program or level of service based on screening criteria and later is determined to either be progressing faster or not progressing as expected to meet the required time frames, the patient will be transferred to the more appropriate level of care based on their clinical status.

3.      **Offsite Forensic Facilities**

(a) DHS is currently planning an offsite forensic facility with day competency restoration treatment in a county jail.  This is a five days per week, eight hours per day program to provide competency restoration treatment to patients who need a structured environment, similar to a mental health unit, but do not need the services of an inpatient psychiatric hospital.  Patients will be identified according to their acuity, and treatment will be individualized accordingly.

(b) Based on the success of this initial program and in the assessment of future program needs, DHS may request funding for additional offsite forensic facilities (including, but not limited to, a female only offsite forensic facility) to meet the needs of the population.  DHS will determine funding and staffing patterns following a review of the current program outcomes and inflationary costs.  If DHS determines that there is a greater number of patients needing inpatient care, DHS will request funding for additional beds at USH or another appropriate alternative therapeutic unit.  This funding request would be similar to the funding at that time for one USH forensic unit (current cost is approximately $4.5 million dollars).  Staffing levels would be similar to a current forensic unit based on this budget information.

(c) In 2017, the first offsite forensic program will be developed in partnership with Salt Lake County due to its Metro Jail's central geographic location and the large number of competency restoration referrals that arise from Salt Lake County.  This program has an annual operating budget of approximately $3 million.  Funding will be available by July 1, 2017.  DHS will begin to develop and coordinate operational procedures, recruitment and implementation of the program as soon as funding is assured through the legislative process.  It is intended that actual program implementation will begin no later than September 30, 2017.

In developing contracts for offsite forensic facilities, provisions will be included that address training for the correctional personnel including but not limited to:  Crisis Intervention Team (CIT) training and training from the USH Psychiatric Technician training modules.  The jail will provide 24-hour emergency psychiatric and emergency medical care of patients when forensic staff are not on site and forensic programming is not being conducted.  Subject to the terms of the contract(s) for each offsite forensic facility and available funding, the anticipated staffing and training of the offsite forensic facility will be commensurate with their counterparts at the USH.  Patient programming and staffing levels at each offsite forensic facility will be guided by a Program Manual that will soon be developed, subject to modification by the USH Forensic Director, based upon the physical environs of the facility, availability of security staff, and other contract provisions to be determined once each offsite forensic facility is identified.

**4. Outreach Program Services**

Since 2015, the Utah Legislature has recognized the value of DHS' Outreach Program whereby clinicians provide competency restoration treatment to patients by conducting weekly visits to

those who are:  (1) released to the community by the court; (2) housed in their home community jail; or (3) in prison.  These services are provided to patients whose screening indicates that they are likely to show meaningful progress towards restoration of competency within 30 days, whose symptoms are stabilizing, and who are likely to be referred for re-evaluation and restored to competency within sixty (60) days.

Some Outreach Program patients will remain in their own county based on the following factors: (a) closeness to family and other supports; (b) desire to stay in the area; (c) upcoming hearing and efficiency in time by not transporting to another area; (d) closeness to legal representation; (e) significant progress with current situation; or (f) gender as the offsite forensic facility programming is male only at this time.

5.      **Projecting Future Needs**

     (a) USH has projected that the annual number of pretrial detainees in Utah's county jails for which custody or commitment orders will have been issued will continue to increase.  If the number of court-ordered pretrial detainees does not increase, USH will continue to monitor trends each year to revise projections.

     (b) USH believes that, depending on system changes including the addition of new levels of care and program efficiencies decreasing length of stay in all programs and facilities, it may need additional competency restoration Outreach Program professionals who provide screening, assessment, and treatment services.  This will be closely monitored and evaluated based on length of time to access these services and the length of stay in these services in the context of the entire system.

     (c) USH believes that, depending on system changes including the addition of new levels of care and program efficiencies decreasing length of stay in all programs and facilities, it may need additional forensic evaluators who are employed to conduct evaluations for the Outreach Program if projections are accurate.  This will be closely monitored and evaluated based on length of time to access these services and the length of stay in the Outreach Program in the context of the entire system.

     (d) USH will annually evaluate the state's ability to meet the respective service level need and projected number of patients requiring competency restoration treatment, and request additional funding to adequately provide services to all those court-ordered to DHS for purposes of competency restoration treatment. The amount to be requested will be determined by the level of service required to meet the acuity needs of those committed to DHS, taking into consideration the outcomes of each program in meeting the timeframes for competency restoration in the Settlement Agreement and relevant statutes, inflationary costs, and other factors.

**6. Expansion of USH Forensic Unit**

In addition to the establishment of the offsite forensic facilities referenced in paragraph 3 of this strategic plan, the State projects that, depending on system changes including the addition of new levels of care and program efficiencies decreasing length of stay in all programs and facilities, there may be further need for increased inpatient treatment capacity. The current capacity of the USH forensic unit is 100 patients for all forensic commitments required by law, including NCP, guilty and mentally ill, and not guilty by reason of insanity. The current USH forensic unit was designed to expand by being able to add additional 25-bed units to the existing structure to a capacity of 200 beds. Based on the number of future court referrals and timeframes for competency restoration services, the State may need to request additional funding for the construction or procurement of another facility on or off the USH campus. This will be closely monitored and evaluated based on length of time to access inpatient services and the length of stay in the context of the entire system.

**7. Post-Treatment Follow-up**

DSAMH/USH will continue to evaluate the most efficient and cost-effective programs and interventions to assist pretrial detainees in maintaining their competency. USH staff will work with counties and provide case management to help monitor and support the patient in their restoration status and facilitate continuity of care.

**8. Efficiency Improvements**

Outcomes reflect operational efficiencies and clinical effectiveness. Utah's adult mental health competency restoration outcomes will be monitored monthly and evaluated on a quarterly basis at which time changes will be considered to strengthen the results. Adjustments in screening, assessment, treatment, monitoring, program placements, and delivery of services will be made where deficiencies are identified. Outcome indicators are as follows:

1. Length of time from court-ordered referral to treatment program admission;
2. Length of stay in any of USH's competency restoration treatment programs;
3. Percent of court-ordered referrals screened in a timely manner (*i.e.*, within seventy-two (72) hours, excluding weekends and holidays, of DHS's receipt of the district court order for competency restoration treatment);
4. Percent of patients screened into the Outreach Program who are restored or not restored within 60 days; and
5. Percent of patients treated within USH's forensic system who are found competent to proceed.

Targets are identified and adjusted based on best practice standards, baseline measurements and agreements made during system monitoring. Monitoring systems and outcome measures are utilized to ensure individuals within each level of service have been properly placed into programming and changes in status result in reassessment of

the patient.  Monitoring also ensures that patients in each level of care are not "lost in the system."  LOS and competency status data will receive ongoing utilization reviews to flag those patients who may not be responding appropriately as expected in each level of care.  Nationally, outpatient and jail-based programs have shorter LOS than inpatient programs.

Ongoing utilization review means that treating clinicians are reassessing the appropriateness of the current treatment program for the patient with each treatment encounter, and making a determination about program placement or movement at the earliest and most appropriate time.

If at any time it is determined a patient is not progressing in treatment, USH will reassess for the appropriate level of service.

## 9.  Forensic Evaluation System (FES)

When a district court judge orders a competency evaluation, the order should be entered into DHS' Forensic Evaluation System (FES), which is automated to coordinate with state examiners contracted to complete ordered evaluations.  Some counties or courts may elect to assign evaluators independent of the FES.  Regardless, all orders and evaluations are monitored in the FES.  The examiners provide an initial report to the court and parties within 30 days of receipt of the court's order.  The examiner may inform the court in writing that additional time is needed to complete the report.  The examiner shall have up to an additional 30 days to provide the report if requested in writing.  The examiner shall provide the report within 60 days from the receipt of the court's order unless, for good cause shown, the court authorizes an additional period of time to complete the report.  If after reviewing the forensic evaluation the judge determines an individual is NCP, the court should send the order for competency restoration to DHS via email into the FES.  USH and DSAMH monitor the FES to ensure that all components of the service delivery system are addressed and correspondence with the court and the parties is done in a timely manner under the current statutory scheme.  Discovery and other documents and outcome data are also tracked through the FES.

## 10.  Utah Competency Restoration Service Delivery System (See Flow Chart)

The district court should send orders for competency restoration to the USH Legal Service Office, which manages the FES system.  Information regarding referrals and evaluations is managed in the FES.  All patients ordered to DHS for competency restoration are screened to determine the appropriate level of care needed.

### A.  Screening Process

Within seventy-two (72) hours, excluding weekends and holidays, of receiving the court order, USH forensic staff shall determine which level of service is appropriate for the patient using a screening tool approved by the USH Forensic Director.  The screening process utilizes best practice evaluation tools to determine whether:

1. A patient is likely to be restored to competency through treatment available by the Outreach Program;
2. A patient is likely to be restored to competency through treatment available at an offsite forensic facility;
3. A patient needs inpatient hospital services at the USH forensic unit;
4. A patient is likely not restorable;
5. A patient requires referral to DSPD services; or
6. A patient has other dispositional needs, such as a nursing home placement.

The Initial Competency Restoration Screening tool to be used in the screening process is attached as Appendix A. The screening process may undergo further development and refinement, to include specific scoring guidelines for patient level of service.

**Note**: Female patients who have been found not competent to proceed will be referred to either the Outreach Program or USH unless and until another program is identified to meet the needs of females who would otherwise be screened to an offsite forensic facility, including, but not limited to, the establishment of a female only offsite forensic facility program.

**B. Screening Criteria**

The following represents general criteria used by USH Forensic Unit professionals to determine level of service needed:

a. Patient's attitude towards and consent to take medication;
b. Patient's response to medication treatment;
c. Level of risk (i.e., suicide, self-harm, harm to others, etc.);
d. Physical health/medical concerns;
e. Current progress towards competence; and
f. Patient's willingness to engage in treatment.

If an individual is placed in the Outreach Program, competency restoration treatment begins within 14 days of receiving the court order requiring such treatment, though Outreach Program clinicians strive to begin treatment services within 7 days or less of receiving the court order. Part of that treatment is the engagement of jail personnel to provide medication management services if such services are not already in place for patients in their home community jails. If the patient is screened for treatment in an offsite forensic facility or referred to USH's forensic unit, the patient is transferred into the first open bed within 14 days of receiving the court order requiring such treatment.

**C. Treatment Disposition**

If a patient is determined to be a candidate for the Outreach Program, an offsite forensic facility, an alternative therapeutic unit, or USH's forensic unit, an individualized treatment plan (ITP) is established.

If, at any time, a USH Forensic Unit professional determines that a patient is likely not restorable, the USH administrator will request a re-evaluation from a forensic evaluator. The forensic evaluator conducts the evaluation and a report is sent to the court for further disposition.

If, at any time, a USH Forensic Unit professional determines that a patient is not likely to restore to competency through the Outreach Program, at an offsite forensic facility, or at an alternative therapeutic unit, then coordination is made with the USH staff for admission to inpatient level of care at USH. The USH Forensic Outreach Competency Progress Assessment tool is attached as Appendix B.

If it is determined that a patient may meet the criteria for an intellectual disability, a referral is made within seventy-two (72) hours, excluding weekends and holidays, to DSPD for competency restoration services. If DSPD does not accept the referral, the patient is screened for USH treatment services and all timeframes apply.

If a patient is determined at any time throughout the screening or treatment process to meet the criteria to be found competent to proceed, the USH administrator will request a re-evaluation from a forensic evaluator. The forensic evaluator conducts the evaluation and a report is sent to the court for further disposition.

## D. Treatment Services

The program administrators at each level of service coordinate with the treating staff and other agencies involved in the custody or care of the patient to develop an ITP and identify necessary treatment modalities. Types of competency restoration interventions may include, but are not limited to, individual instruction; individual therapy; group therapy; educational or psychoeducational materials; assignments; recreational therapy; occupational therapy; and medication management. Treatment staff may also coordinate services with jail treatment providers or LMHAs for medication management and other appropriate medical services. The competency curriculum is consistent with criteria in Utah's competency statutes. The following program outline describes the restoration treatment delivery system at each level of service:

### 1. Referral Screening Process
   a. Each individual is screened by a qualified USH Forensic Unit professional within seventy-two (72) hours, excluding weekends and holidays, of receiving a court order for competency restoration.
   b. A qualified USH Forensic Unit professional utilizes scoring guidelines from the initial screening tool (Appendix A) to identify the appropriate level of service to which the individual should be referred.

    c.  A qualified USH Forensic Unit professional will continue to visit with all referrals weekly while the individual is being evaluated for the appropriate program.

**2. Outreach Program**

    a.  The Outreach Program is designed for patients who are likely to show meaningful progress towards restoration of competency within 30 days, whose symptoms are stabilizing, and who are likely to be referred for re-evaluation and restored to competency within 60 days.

    b.  If the Outreach Program clinician determines that the patient is appropriate for treatment through the Outreach Program and the county jail is deemed a sufficient location in which to provide competency restoration services, the Outreach Program clinician will commence treatment in the home community jail after considering the criteria outlined in Section 4 above, "Outreach Program Services."

    c.  Outreach Program staff will arrange weekly treatment encounters with patients who are on a release to the community by the court.

    d.  If the patient is female and is appropriate for the Outreach Program, weekly visits will occur in the home community jail.

    e.  An ITP is established for each Outreach Program patient based on individualized needs and identified barriers to competence.

    f.  Coordination among Outreach Program staff occurs weekly to evaluate treatment progress, modify the patient's ITP as indicated, and coordinate medication management with local county jails as required in Utah Code Ann. Sect. 17-43-301(5)(a)(i) or pursuant to a contract anticipated to be entered with Salt Lake County for an offsite forensic facility.

    g.  An Outreach Program clinician visits with the patient for at least 60 minutes weekly to provide competency restoration treatment and psychoeducational material from the Outreach Competency Training Program manual addressing barriers to competence identified in the ITP.  The manual is attached as Appendix C.

    h.  Patients are reassessed minimally every two (2) weeks to determine progress towards competence.

    i.  Patients will be disqualified from competency restoration treatment in the Outreach Program if he or she exhibits suicidal ideations with intent to harm, engages in repeated acts of self-harm, persistently refuses medications necessary for competency restoration with no rational basis, exhibits a significant decline in clinical stability, or is diagnosed with a moderate to severe intellectual or developmental disability.

    j.  If an Outreach Program clinician determines that a patient should be disqualified from the Outreach Program, the patient will be transferred to USH's forensic unit, an Offsite Forensic Facility, or

an Alternative Therapeutic Unit within seventy-two (72) hours, excluding weekends and holidays.

k. Patients who are not ready to be referred for reevaluation for restoration status within sixty (60) days will be re-assessed by USH staff for the appropriate level of competency restoration services.

l. If a qualified USH Forensic Unit professional determines that the Outreach Program is no longer clinically appropriate or effective for a patient, the patient must be transferred to USH's forensic unit, an Offsite Forensic Facility, or an Alternative Therapeutic Unit within seventy-two (72) hours, excluding weekends and holidays.

3. **Offsite Forensic Facility**

a. An offsite forensic facility is a competency restoration program administered by USH forensic personnel, or by similarly qualified professionals employed by DHS's contractor, at a location other than the USH Campus. Expected capacity at an offsite forensic facility is twenty-two (22) to forty (40) beds.

b. A competency restoration program can be established in any secure offsite facility that has the availability of security staff. This is typically a jail or other secure setting. Any site can be considered if it meets the need for a secure, structured environment. If the space is located in or leased from a county jail, the space and the residents must be segregated from the jail's general inmate population.

c. A competency restoration program at an offsite forensic facility is designed for patients that are in need of more comprehensive treatment than those referred to the Outreach Program and are likely to be restored within two to four months. These patients are not considered a risk of immediate harm to self or others, do not have high acuity medical needs, and are demonstrating that they are willing to engage in treatment, including accepting medication management.

d. Patients will be identified by psychiatric acuity for purposes of bunking assignments, safety assessment, and in creating an ITP.

e. Patients receive day treatment services Monday through Friday. Operational hours may vary but be minimally set from 8:00 a.m. to 5:00 p.m. DHS anticipates some programming may occur in the evenings and on weekends.

f. A treatment team assesses and develops an ITP for each patient based on individualized needs and identified barriers to competence.

g. It is anticipated that the treatment team will consist of a psychiatrist, psychologist, social workers, nursing staff, psychiatric technicians, recreation therapist, case worker, and office specialist,

whose training and credentials will be commensurate with their counterparts at the USH.

h. Treatment services may include any of the following: medication management, individual therapy, group therapy, psychoeducation, recreation therapy, occupational therapy and other modalities identified as necessary for the patient's ITP. A schedule of USH programming is attached as Appendix D as an exemplar. Appendix D.

i. Patient programming and staffing levels at each offsite forensic facility will be guided by a Program Manual that will soon be developed, subject to modification by the USH Forensic Director, based upon the physical environs of the facility, availability of security staff, and other contract provisions to be determined once each offsite forensic facility is identified.

j. It is anticipated that a contractual arrangement with a county jail or other appropriate offsite facility will provide the program with security personnel, medical services, food, clothing, medications, and medical and mental health crisis services after hours.

4. **USH Inpatient Restoration Services**

a. Patients who are not found to be appropriate for the Outreach Program or an offsite forensic facility treatment program are referred to USH for inpatient services within seventy-two (72) hours, excluding weekends and holidays.

E. **Evaluations**

All court-ordered NCP patients will have an initial assessment once they are screened and admitted to one of USH's treatment programs. A report will then be sent to the court pursuant to Utah Code Ann. Sect. 77-15-6. Any time after the patient is found NCP but is showing significant progress towards restoration, a referral can be made for competency re-evaluation by a forensic evaluator. The referral should be made within seventy-two (72) hours, excluding weekends and holidays, of the determination by USH Forensic Unit professionals that the individual has made significant progress towards restoration. Once a referral for follow-up evaluation is made to a forensic evaluator, the evaluation will be completed within fourteen (14) working days. The evaluation report is sent to the court promptly upon completion. The USH Clinical Director or designee certifies all reports recommending the individual be found competent to proceed according to Utah's competency statutes.

F. **Collaboration**

USH Forensic Unit professionals work in consultation with jail staff, court personnel, families, LMHAs, or others involved in the care, custody or treatment to ensure continuity of care and communication. The USH Legal Services Office and Forensic Director ensure that the courts are kept apprised of the progress and status of all individuals ordered to DHS consistent with Utah's statutory framework.

15



← → At anytime a defendant is not progressing within a level of service a referral is made to the appropriate program that meets the needs of the individual

2/17